**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| vs. | ) |
| | ) 2:19-cv-702-TFM-C |
| JAMES WALLACE NALL, III, | ) |
| MICHAEL HALE SMITH, | ) |
| MICHAEL DWAINE SMITH, | ) |
| ROBERT WALTER SMITH and | ) |
| WALTER VICE TUTT, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

1.  The Securities and Exchange Commission ("Commission" or "SEC") hereby files its first amended complaint, and alleges the following:

**SUMMARY**

2.  This matter involves insider trading in advance of the July 19, 2016 public announcement of a merger between Golden Enterprises, Inc. ("Golden Enterprises"), formerly a NASDAQ-listed potato chip manufacturer based in Birmingham, Alabama, and Utz Quality Foods, LLC ("Utz"), a privately held company based in Hanover, Pennsylvania.

3.  James W. Nall, III ("Nall") misappropriated material non-public information ("MNPI") about the merger from his father, a director of Golden Enterprises.  Nall did not trade on the information, but he tipped his close friend and business partner, Michael

Hale Smith ("Hale Smith"), who in turn tipped his father, Michael Dwaine Smith ("Michael Smith, Sr."), and boss, Walter Vice Tutt ("Tutt").

4.  Michael Smith, Sr. then tipped his son Robert Walter Smith ("Robert Smith").

5.  Hale Smith, Michael Smith, Sr., Robert Smith, and Tutt, each of whom knew Nall and understood that his father was a director of Golden Enterprises, purchased Golden Enterprises' stock in multiple purchases in advance of the merger announcement, collectively realizing profits of approximately $437,000.

6.  Notably, these traders all lived or worked in or around Thomaston, Alabama, a small rural town that Nall – who lived and worked in Birmingham – had adopted as his "second hometown."

7.  In addition, Nall used the misappropriated information to tip an old friend in Sandy Spring, Maryland, telling the friend that "something big" and positive was going to happen in regard to Golden Enterprises, and recommending that he purchase Golden Enterprises stock.  Nall's Maryland friend did not personally buy Golden Enterprises stock, but he and his wife recommended to their adult daughter and son that they do so based upon Nall's tip.  Both adult children of Nall's Maryland friend purchased Golden Enterprises stock before the public announcement of the merger with Utz and sold the stock subsequent to the announcement for a profit.

8.  Defendants Nall, Hale Smith, Tutt, Michael Smith, Sr., and Robert Smith have engaged, and unless restrained and enjoined by this Court, will continue to engage in acts and practices which constitute and will constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## JURISDICTION AND VENUE

9.  The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the defendants from engaging in transactions, acts, practices and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement of illegally obtained funds and other equitable relief, and for civil money penalties.  This Court has jurisdiction of this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.  The defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

11.  Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendants, except for Nall, reside within this district. Furthermore, certain of the actions set forth herein occurred within the Southern District of Alabama.

## THE DEFENDANTS

12. **Nall**, 58 years old, is a resident of Birmingham, Alabama.

13.  **Hale Smith**, 45 years old, is a resident of Thomaston, Alabama.

14.  **Tutt**, 54 years old, owns Tutt Land Co., which is located in Thomaston, Alabama and sells tracts of land throughout Alabama, Mississippi, Tennessee, and Florida.  Tutt resides in Demopolis, Alabama.

15. **Michael Smith, Sr.**, 69 years old, is Hale Smith's father. Michael Smith, Sr. is a retired cement plant worker who lives in Thomaston, Alabama.

16. **Robert Smith**, 31 years old, is Hale Smith's brother and Michael Smith, Sr.'s son. Robert Smith lives in Thomaston, Alabama.

### RELATED ENTITIES AND INDIVIDUALS

17. **Golden Enterprises, Inc.** was a Delaware corporation headquartered in Birmingham, Alabama. Golden Enterprises made the Golden Flake brand of potato chips, among other products. Golden Enterprises' common stock was registered with the Commission pursuant to Exchange Act Section 12(b) and was traded on the NASDAQ under the symbol "GLDC" until it filed a Notice of Termination of Registration with the Commission on October 13, 2016.

18. **Utz Quality Foods, LLC** is a privately held snack food company based in Hanover, Pennsylvania. In October 2016, Utz completed its acquisition of Golden Enterprises.

19. **James Wallace Nall, IV**[1] ("Nall, Sr."), 78 years old, is Nall's father. Nall, Sr. was a director of Golden Enterprises from 1991 until Utz completed its acquisition of Golden Enterprises in October 2016. Nall, Sr. resides in Birmingham, Alabama.

20. **Nall's Maryland Friend,** an adult male, is a resident of Sandy Spring, Maryland.

21. **Wife of Nall's Maryland Friend,** an adult female, is a resident of Sandy Spring, Maryland and resides with her husband. She is friends with Nall's former wife.

---

[1] It is unusual in this matter that Nall III is the son, while Nall IV is his elder father. To avoid any confusion in the pleadings, the Commission has referred to the defendant as Nall, and to his non-party father as Nall Sr.

22. **Adult Daughter of Nall's Maryland Friend**, 23 years old, upon information and belief, resides regularly in Atlanta, Georgia. However, during the Covid-19 pandemic the Adult Daughter is a temporary resident with her parents in Maryland.

23. **Adult Son of Nall's Maryland Friend**, 30 years old, is a resident of Baltimore, Maryland.

## FACTS

### A.    Nall's Relationship to Golden Enterprises and the Other Defendants

24. Defendant Nall's father, Nall, Sr., is a prominent real estate developer based in Birmingham, Alabama, who was also a director of Golden Enterprises for more than 25 years (until the company's sale to Utz).

25. Nall works with his father in Birmingham at their family-owned real estate development company, Nall Development Corp. ("Nall Corp."). Prior to the merger between Golden Enterprises and Utz, Nall Corp. also owned 196,000 shares of Golden Enterprises' stock.

26. Over the last 15 years, Nall has developed close personal and business relationships with a group of individuals residing in or near Thomaston, Alabama, a rural, 400-person, "one-traffic-light" town located in southwestern Alabama.

27. Nall initially became connected to Thomaston when his ex-wife's cousin married Hale Smith, a local real estate agent and developer.

28. Nall and Hale Smith subsequently became close friends and business associates, developing multiple shared business ventures focusing primarily on purchasing, improving, and reselling hunting properties.

29.  Nall visits Thomaston frequently, often staying at a property adjacent to Hale Smith's house.

30.  Over the years, Nall's friendship with Hale Smith has extended to Hale Smith's brothers, Michael Smith, Jr. and Robert Smith, as well as their father, Michael Smith, Sr.

31.  Through Hale Smith, Nall also came to know Tutt, whose real estate company employs Hale Smith as a property broker.

32.  Tutt also acted as the property broker for certain real estate properties purchased by Nall and Hale Smith for development and resale.

33.  Nall's public persona in Thomaston was closely associated with Golden Enterprises.  Nall openly discussed, and all of the defendants were aware of, his father's role with the company.  More generally, Nall was known throughout Thomaston as "Mr. Potato Chip."

**B.**      **Nall Learns Material Non-Public Information From His Father Concerning the Contemplated Merger Between Golden Enterprises and Utz**

34.  On November 17, 2015, Nall, Sr. first became aware of a possible sale of Golden Enterprises at a special board meeting.

35.  Specifically, Nall, Sr. learned: (a) that Utz had made an informal offer to purchase all of Golden Enterprises' stock for approximately a 60-percent premium over the then per-share market price; (b) that Golden Enterprises' majority shareholder supported a sale; and (c) the company was forming a Special Committee to explore a possible sale.  Nall, Sr. was not a member of the committee.

36.  Upon learning of a possible sale of Golden Enterprises, Nall Sr. immediately thought about the possible tax consequences for Nall Corp. due to its holdings of the company's stock.  Around the time of the November 17, 2015 board meeting, Nall Sr. disclosed the contemplated transaction to Nall and their two other partners in Nall Corp., so they could determine the potential tax implications for Nall Corp.

37.  Nall, Sr. also specifically informed the three men that the information was highly confidential, and that they should not engage in any trading in Golden Enterprises stock.

38.  Nall, Sr. further admonished that "nobody that we know can buy any stock, period."

39.  Defendant Nall and the other two partners specifically agreed to maintain the confidential information and not to engage in any related trading activity.

40.  From November 2015 through the merger announcement in July 2016, Nall, Sr. continued to receive formal, periodic updates on the possible sale of Golden Enterprises through his attendance at the company's board-of-directors meetings.

41.  Significantly, Nall, Sr. continued to provide periodic updates on the status and progress of the merger to Defendant Nall and the other partners at Nall Corp.

42.  Nall, Sr. reemphasized the merger's anticipated timeline with them as he grew increasingly frustrated with their apparent lack of progress on related tax issues.

**C.**     **<u>Nall Misappropriates the Information and Tipping Commences</u>**

**a.**   **Summary of the Defendants' Insider Trading**

43.  Nall misappropriated material non-public, deal-related information he received from Nall, Sr., by repeatedly tipping Hale Smith about the detailed progress of the transaction;

44.  Hale Smith traded on the basis of the information, and also tipped his father, Michael Smith, Sr., and boss, Tutt, each of whom also traded on the basis of that information.

45.  Michael Smith, Sr. tipped another son, Robert Smith, who also traded on the basis of the information.

46.  These relationships are diagrammed in the following paragraph.

(Remainder of Page Intentionally Left Blank)

47.



48.  Alternatively, Nall tipped Michael Smith, Sr. and/or Tutt during visits Nall made to Thomaston.

49.  Also alternatively, Hale Smith tipped his brother, Robert Smith regarding the pending merger.

**b.   Individual Trading Activity**

50.  The trading activity for each of the defendants before and after the July 19, 2016 merger announcement is summarized in the following chart:

| Trader | Purchases/Date Range | Total Amount Invested | Sales/Date Range | Illicit Realized Profits[2] |
|---|---|---|---|---|
| Michael Smith, Sr. | 27,150 shares purchased from 11/24/15 to 7/01/16. | $161,381.03 | 1,900 shares sold on 1/28/2016; 25,228 shares sold from 7/20/2016 to 8/5/2016. | $139,774.17 |
| Robert Smith | 6,120 shares purchased from 12/16/2015 to 7/18/2016. | $41,712.59 | 6,120 shares sold from 7/19/2016 to 9/8/2016. | $32,733.98 |
| Tutt | 7,972 shares purchased from 3/18/2016 to 7/18/2016. | $49,810.33 | 7,972 shares sold on 7/19/2016. | $43,955.32 |
| Hale Smith | 36,814 shares purchased from 3/29/2016 to 7/18/2016. | $216,801.00 | 36,814 shares sold on 7/19/2016. | $220,625.84 |

### c.    Aberrational Nature of the Involved Trading Activity

51.  At the time of his initial investment, Michael Smith, Sr., a retired cement plant worker, owned two brokerage accounts, one of which was a rollover IRA from his former employer's retirement plan.  The holdings in his IRA were diversified equities that he purchased based on his own research.

52.  In November 2015, when Michael Smith, Sr. first purchased Golden Enterprises stock, his IRA was valued at approximately $310,000.  At that time, his other

---

[2] These amounts are calculated based on the first-in, first-out accounting method, which satisfies the method described in SEC v. MacDonald, 699 F.2d 47, 54-55 (1st Cir. 1983), because the traders sold their positions a "reasonable time after public dissemination of the inside information."  Although Robert Smith sold a portion of his position two months after the public announcement, Golden Enterprises' share price was approximately the same as the closing share price the day of the public announcement and thus there is only a negligible difference ($551.00) between his realized profits and his profits under the MacDonald test.

brokerage account was worth approximately $103,000 and was invested in a single real estate investment trust.

53.  In the previous 15 months, Smith, Sr. had not purchased Golden Enterprises stock in either account, yet by the time of the announcement, Golden Enterprises stock represented approximately 26 percent of his holdings.

54.  Hale Smith is primarily invested in his real estate business and related joint ventures with Nall.  He and his wife maintained two brokerage accounts which had a combined value of less than $5,000 at the time he began trading Golden Enterprises stock.

55.  Hale Smith had not made any stock purchases in the 15-month period preceding his trading in Golden Enterprises stock.  Thus, Hale Smith's Golden Enterprises purchases represented virtually the entirety of his trading activity and associated investment holdings.

56.  Robert Smith worked as an independent contractor for his brother's small business (which was sold subsequent to the merger announcement).

57.  Robert Smith had no apparent history of trading stocks, and when he opened his brokerage account two weeks before his first purchase of Golden Enterprises stock, he stated his net worth on his account opening form as less than $50,000 and his liquid net worth as less than $15,000.

58.  It appears that Robert Smith borrowed money, likely from his father, to invest in Golden Enterprises stock because of his limited financial means.

59.  Tutt owns a real estate brokerage company.  His reported annual income in 2015 was between $250,000 and $500,000.

60.   Tutt held two IRAs at a single broker dealer with account values of $127,000 and $7,000 prior to September 2015.  In that month, Tutt opened a taxable brokerage account and transferred $45,000 cash into that account.

61.   Tutt's first purchase of Golden Enterprises stock on March 18, 2016, was the first order Tutt had placed in that account since he opened it.  The only other trade he made during the relevant period was a purchase of BP stock.

62.   Additionally, while Golden Enterprises' share price generally increased during the period of the merger negotiations, there were no major price fluctuations related to any public announcements made by the company (or other events) that would explain the defendants' trading activity.

63.   Finally, Golden Enterprises' stock was relatively thinly traded, and the defendants' purchases comprised a significant percentage of total trading volume on certain days.  For example, Hale Smith's initial purchases of Golden Enterprises stock, made between March 28 and March 30, 2016, comprised almost 40 percent of the total trading volume during that same period.

     **d.**     **Events, Tips, and Trading Chronology**

     **i.**     ***November 17, 2015 Board of Directors Meeting/Michael Smith, Sr.'s and Robert Smith's First Trades***

64.   As noted above, Golden Enterprises board of directors, including Nall, Sr., first discussed the sale of the company on November 17, 2015.  On Friday and Saturday, November 20 and 21, 2015, "right around" the time that Nall first learned about the possibility of Golden Enterprises being sold, Nall (who was in Birmingham) and Hale Smith (who was in Thomaston) had telephone conversations lasting 13 minutes and 19 minutes.

65.  Although Nall and Hale Smith spoke by phone regularly, these calls lasted for an unusually long time.

66.  Both Hale Smith and his father Michael Smith, Sr. were in Thomaston at this time.

67.  On Tuesday, November 24, 2015, based on a tip from either Nall or Hale Smith, Michael Smith, Sr. purchased 2,000 shares of Golden Enterprises stock in his own account.  Michael Smith, Sr. placed the orders electronically without using a broker.  The same day, he opened an IRA account in his wife's name and soon after electronically purchased 5,000 more shares of Golden Enterprises stock in her account.

68.  Neither Michael Smith, Sr. nor his wife had ever held Golden Enterprises stock before these purchases.

69.  Michael Smith, Sr.'s initial purchase in his own account represented approximately three percent of the account balance at that time, while his initial purchase in his wife's account was the only equity position.

70.  A few days later, Defendant Robert Smith opened a Vanguard rollover IRA account with a $500 deposit, and then, based on a tip from either Hale Smith or Michael Smith, Sr., purchased 100 shares of Golden Enterprises' stock for $483.35.

71.  Robert Smith did not hold any other positions in this account for at least the following 20 months.

72.  On Thursday, January 28, 2016, Michael Smith, Sr. sold all but approximately $500 of the Golden Enterprises stock in his account (but did not sell any shares in his wife's account).  Thereafter Michael Smith, Sr. continued to purchase

Golden Enterprises stock, and did not make any further sales until after the merger was announced.

### ii. *March 4, 2016 Special Committee Meeting/Trading by Tutt and Michael Smith, Sr.*

73.   On March 4, 2016, the company's financial advisor identified a two-step auction process that could "realistically maximize" shareholder value.  The financial advisor also outlined a timeline for completion of the deal.

74.   On March 16, 2016, Nall, Sr. revisited the tax issues associated with the pending merger with his Nall Corp. partners.  During that meeting or shortly thereafter, Nall was apprised of the developments in the merger negotiations.

75.   On Thursday, March 17, 2016, Nall traveled from Birmingham to Thomaston, at least in part to join Hale Smith and Tutt for the opening weekend of turkey hunting season.

76.   On the morning of March 18, 2016, Tutt, based on a tip from either Nall or Hale Smith, texted his broker directing him to purchase $20,000 of Golden Enterprises stock.

77.   This was the first order Tutt had placed in his account since he opened it on September 2, 2015.

78.   While his broker and Tutt had discussed other stocks during that period, they had never discussed Golden Enterprises stock prior to this text.

79.   Tutt changed his order to $10,000 of Golden Enterprises stock after his broker texted back that the stock was thinly traded and near the top of its three-year range.

80.  On March 18, 2016, based on a tip from either Nall or Hale Smith, Michael Smith, Sr. also purchased 1,886 additional shares of Golden Enterprises stock (886 shares in his account and 1,000 shares in his wife's account).

### iii.  *March 23, 2016 Special Committee Meeting/Initial Trading by Hale Smith*

81.  On March 23, 2016, the Special Committee met to compile a list of prospective buyers of the company.  The next day, Nall and Hale Smith spoke on the phone twice for a total of 16 minutes.  Nall and Hale Smith had five more short phone calls with each other from March 25, 2016 through March 27, 2016.

82.  Between March 29 and April 4, 2019, based on tips from Nall, Hale Smith purchased 10,555 shares of Golden Enterprises stock in his wife's IRA account.

83.  That account had not been used to trade any securities for at least the prior 15 months.  Hale Smith placed the orders himself electronically.

84.  Hale Smith purchased an additional 635 shares of Golden Enterprises stock between April 4 and April 6, 2016 based on tips from Nall.

### iv.  *April 6, 2016 Special Committee Meeting/Trading By Hale Smith, Tutt, and Michael Smith, Sr.*

85.  On April 6, 2016, the Special Committee met to discuss prospective buyers that were to be included in the auction process, including several that would, in the opinion of the company's financial advisor, be "highly interested in a transaction," including Utz.  The auction process was expected to take place over a two-month period.

86.  The board of directors was formally updated on April 7, 2016.  However, Nall, Sr. knew such details before attending the April 7, 2016 board meeting.

87. Specifically, notes made by one of the Nall Corp. partners indicate that Nall, Sr. updated the partners, including Nall, on April 5, 2016, indicating that the deal would happen "sooner rather than later."

88. On April 6, 2016, Nall and Hale Smith had six phone calls with each other.

89. Between April 7 and April 18, 2016, based on tips from Nall, Hale Smith purchased an additional 4,000 shares of Golden Enterprises stock.

90. During the same time, based on tips from either Nall or Hale Smith, Michael Smith, Sr. purchased an additional 500 shares; and Tutt purchased an additional 1,869 shares.

**v.   *April 18, 2016 Special Committee Meeting/Trading by Robert Smith, Hale Smith, and Michael Smith, Sr.***

91. On April 18, 2016, the Special Committee held a meeting in which they finalized the list of buyers to participate in the auction process.  At this meeting, the company's financial advisor indicated that "the climate of the financial markets was favorable" for a sale.

92. Later that day, Hale Smith and Nall had two short phone calls.

93. Between April 18 and April 19, 2016, based on tips from Nall, Hale Smith purchased 4,000 shares of Golden Enterprises stock.

94. During that same time, Michael Smith, Sr. purchased an additional 3,550 shares of Golden Enterprises stock based on tips from either Nall or Hale Smith.

95. On April 19, 2016, based on tips from either Hale Smith or Michael Smith, Sr., Robert Smith also purchased Golden Enterprises stock in a brokerage account that he opened only two weeks earlier, and funded with a $13,000 cash deposit.

96. Michael Smith, Sr. gave Robert Smith the money to make this purchase.

97.   Until late June, 2018, there was little new information from the Special Committee concerning progress on the sale, as the prospective buyers were conducting due diligence.  During this period, Hale Smith purchased an additional 3,694 shares of Golden Enterprises stock based on tips from Nall, and Robert Smith purchased an additional 517 shares based on tips from either Hale Smith or Michael Smith, Sr.

**vi.**   ***June 28, 2016 Special Committee Meeting/Trading by Michael Smith, Sr., Robert Smith, and Tutt***

98.   On June 28, 2016, the Special Committee was updated by the Company's financial advisor concerning the progress made by the auction participants with respect to their due diligence.  The critical takeaway was that Utz and another company indicated their desires to move forward as quickly as possible.

99.   Nall, Sr. likely learned of this information, and shared it with Nall, prior to this meeting.  Specifically, while the negotiations were ongoing, members of the Special Committee were periodically provided with "process update materials," which outlined the specific progress made by each company in the due diligence process.

100.   Nall travelled to Thomaston from June 23, 2016 through June 25, 2016.

101.   On June 24, 2016, Nall wrote Hale Smith a check for $27,000 purportedly to cover expenses associated with one of their joint business ventures.  Hale Smith deposited the check into his personal banking account and, based on tips from Nall, used a substantial amount of these funds to purchase an additional 4,000 shares of Golden Enterprises stock on June 27, 2016.

102.   Hale Smith also purchased 3,000 shares on July 6, 2016 based on tips from Nall.

103.  Between June 24 and July 6, 2016, Michael Smith, Sr. purchased 4,548 shares and Tutt purchased 1,359 shares of Golden Enterprises stock, based on tips from Nall or Hale Smith.

104.  During this same time, Robert Smith received a cash deposit of $20,000 from an unknown source and used those fund to purchase 3,027 additional shares of Golden Enterprises stock.

**vii.**   ***July 12, 2016 Special Committee Meeting/Trading by Hale Smith, Robert Smith, and Tutt***

105.  The Special Committee met on July 12, 2016.  At the meeting, Golden Enterprises' financial advisor indicated that the only final bid submitted was from Utz, which was prepared to offer $11.50 per share, more than previously expected by the company.

106.  Nall, Sr. told one of his partners about Utz's offer (including the share price) on July 11, 2016 showing that Nall, Sr. obtained information about the merger before the Special Committee meeting.

107.  Between July 11, 2016 and July 18, 2016, Nall and Hale Smith had a flurry of 25 telephone calls with a total duration of more than 3 hours.

108.  On July 15, 2016, based on a tip from Nall, Hale Smith purchased 5,000 shares, Robert Smith purchased 1,166 shares, and Tutt purchased 2,631 shares of the Company's stock.

109.  After the deal was announced on July, 19, 2016, the trading defendants sold all of their shares, realizing total profits of approximately $437,000.

110.   The day the merger was announced, Michael Smith, Sr. called Nall for 12 minutes.  This call was only the second time Michael Smith, Sr. and Nall had spoken on the phone all year; the only other occasion was a week earlier.

**Hale Smith and Tutt Each Contribute to Nall's "Charity" Project**

111.   Shortly after Nall learned of the proposed sale of Golden Enterprises (and tipped Hale Smith), Nall and Hale Smith developed a plan to help revitalize Thomaston's "dying" downtown by purchasing and renovating an old "general store" and potentially using it as a deer-hunting museum.

112.   Immediately before Tutt began trading in Golden Enterprises stock, he agreed to relocate his real estate business to the top floor of that building.

113.   Nall, who had adopted Thomaston as his "second hometown," has described the project as a "charity" that carried no realistic prospects of any associated economic returns.

114.   Through a complex ownership structure, an entity owned by Hale Smith, Nall, and Michael Smith, Jr. split the cost and renovation of the building with Tutt.  Tutt contributed approximately $177,000 to the cost of the building, and Hale contributed approximately $60,000.

115.   After Hale Smith sold his Golden Enterprises shares, he opened a checking account – in the name of the limited liability company that he and Nall were using to invest in the building – and deposited $27,000 as repayment of the "loan" from Nall that Hale Smith had used for a portion of his earlier Golden Enterprises stock purchases.

**D.      Nall Misappropriates the Information To Other Third Party Friends, And Trading Ensues**

116.    Nall is friends with a husband ("the husband") and wife ("the wife") couple currently residing in Sandy Spring, Maryland (collectively, "the Maryland couple").   The Maryland couple have two adult children, a daughter and a son, aged approximately 23 and 30, respectively.

117.    Since approximately the mid-1980s, Nall has visited with, vacationed with, and conversed with the Maryland couple regularly.

118.    Both members of the Maryland couple are aware that one or more members of Nall's family is affiliated with Golden Enterprises.

119.    Nall and the husband of the Maryland couple frequently discuss their respective business dealings with one another.

120.    Between mid-November 2015 and early 2016, Nall informed the husband that "something big" was about to happen with Golden Enterprises and that the development would be positive.  Nall recommended that the husband purchase Golden Enterprises stock in view of the expected development.  The wife of the Maryland couple heard Nall make this recommendation to her husband.

121.    Neither member of the Maryland couple personally purchased Golden Enterprises stock.  Both of their adult children, however, purchased Golden Enterprises stock based on the information Nall provided.

122.    The husband of the Maryland couple recommended purchasing Golden Enterprises stock to both his son and his daughter based upon what Nall told him.  The wife of the Maryland couple recommended purchasing Golden Enterprises stock to her daughter based on what she heard Nall tell her husband.

123.    With $2800 of her own savings, and $2800 that her mother provided to her, the adult daughter of the Maryland couple purchased approximately 1002 shares of Golden Enterprises stock on or about April 14, 2016, at approximately $5.59 per share. When the merger was announced on July 19, 2016, Golden Enterprises shares jumped from $7.50 per share to $11.88 per share, resulting in a profit of approximately $4,388 for the daughter.

124.    The adult son of the Maryland couple purchased approximately 200 shares of Golden Enterprises stock on or about April 7, 2016, at approximately $5.55 per share. When the merger was announced on July 19, 2016, Golden Enterprises shares jumped from $7.50 per share to $11.88 per share, resulting in a profit of approximately $876 for the son.

125.    As set forth above, the Utz offer price at the time of the merger was $11.50 per share.

### **CLAIM FOR RELIEF**

### **COUNT I—FRAUD**
### **Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

126.  Paragraphs 1 through 125 are hereby realleged and are incorporated herein by reference.

127.  Defendants Nall, Hale Smith, Michael Smith, Sr., Robert Smith and Tutt, in 2015 and 2016, singly or in concert, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a)      employed devices, schemes, and artifices to defraud;

b)      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c)      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

128.   The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

129.   By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

### **I.**

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### **II.**

Issue a permanent injunction enjoining defendants Nall, Hale Smith, Michael Smith, Sr., Robert Smith and Tutt and their agents, servants, employees, attorneys, and all

persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them from violating Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## III.

Issue an Order requiring defendants Hale Smith, Michael Smith, Sr., Robert Smith and Tutt to disgorge all ill-gotten gains as alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

## IV.

Issue an Order requiring defendants Nall, Hale Smith, Michael Smith, Sr., Robert Smith and Tutt, pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. 78u(d)(3) and 78u-1], to pay civil monetary penalties.

## V.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as may be necessary and appropriate.

Respectfully Submitted,

/s/Edward G. Sullivan
Edward G. Sullivan
Senior Trial Counsel

/s/Robert K. Gordon
Robert K. Gordon
Senior Trial Counsel

/s/John G. Westrick
John G. Westrick
Senior Counsel


COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
950 E. Paces Ferry Road, N.E., Suite 900
Atlanta, Georgia 30326
(404) 842-7612